IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 8:23-0749 |
| | ) | |
| | ) | |
| -vs- | ) | **MOTION TO INTRODUCE** |
| | ) | **EVIDENCE OF USE OF POOR** |
| | ) | **INVESTIGATIVE TECHNIQUES** |
| J. CHRISTOPHER MCCASLAN | ) | |

COMES NOW, the Defendant, J. Christopher McCaslan, who moves this Court to allow him to introduce evidence of poor investigative techniques used by officers employed by Calhoun Falls Police Department (CFPD), both during their investigation of this case and in their investigations of other cases during the relevant time period.

## **FACTS**

On the afternoon of November 9, 2021, a mail carrier delivered a letter to 318 Rice Street in Calhoun Falls, South Carolina.  The mail carrier noticed an empty soda can in the mailbox at the time he delivered the letter.

A Calhoun Falls police officer[1] and his fiance' were present at the location when the letter was delivered.  When fiancé opened the letter, she noticed powder in the letter and made the officer aware of it.  The officer then took steps to investigate: he contacted

---

[1] Because the names of these individuals do not appear in any of the publicly filed pleadings in this case, upon the undersigned's information and belief, this pleading will not mention the specific names of these officers or civilian(s) to continue to protect their privacy.

1

his supervisor at the police department, who is now deceased ("deceased officer"), he collected portions of the powder for testing and evidence preservation, he spoke to the mail carrier, and he performed other investigative tasks immediately after the letter arrived.

The deceased officer arrived on scene, and he and the officer continued to investigate. They performed multiple field tests on the powder, which yielded different results,[2] and the deceased officer took possession of the letter, the envelope, and what remained of the powder. According to the Government's discovery, the deceased officer then "put all the items except the drug test kits into an evidence bag and put it on his desk at the (Calhoun Falls Police Department or CFPD)." Bates stamp 008. The Government's discovery contains allegations that a stamp on this envelope is forensically linked to the Defendant. The deceased officer also admitted that he was the one who had put the soda can in the mailbox as a "prank." Bates stamp 008.

During these initial steps in the investigation, the deceased officer notified the chief of police of the CFPD to apprise her of the situation. The officer and deceased officer also enlisted the help of other agencies: an Abbeville County Sheriff's deputy arrived on scene, staying only a short time and leaving, and agents with the South Carolina Law Enforcement Division (SLED) arrived in Calhoun Falls later that afternoon to investigate.

The following day, November 10, 2021, Calhoun Falls Post Office employees notified law enforcement that they had received another suspicious letter from the

---

[2] Ultimately, the powder was found to be a mixture of "milk-based infant formula, water, and Linseed Oil." Bates stamp 003.

Greenville Post Office Distribution Center.  This letter was addressed to the CFPD and also was found to contain a harmless powder.  The second letter referenced the deceased officer as well as another officer with the CFPD, "P.H."

Beginning on November 9th, and continuing in the days, weeks, months, and years that followed, SLED agents conducted multiple, recorded interviews of the officer, deceased officer, P.H., and other law enforcement officers associated with the CFPD. Additionally, some or all of these CFPD officers executed signed statements that discussed investigative steps they took, not only related to the events that occurred on November 9th and later, but also in connection with another possible target of the investigation, the Defendant's wife, "KM."  Both the officer and P.H. had investigated KM within the preceding month for engaging in criminal activity on more than one occasion.  The Government has produced in discovery report(s) that officer wrote about his interaction with KM approximately one month earlier.

Consistent with its obligations pursuant to *Brady* and *Giglio* and Rule 16, the Government has produced these recordings of the interviews, reports, statements, and other materials in discovery.  These materials contain a large amount of exculpatory information provided by CFPD officers.  Most germane to this motion, the discovery the Government has produced contains information provided by law enforcement officers that: (1) mistakes were made during the early phase of the investigation; and (2) a CFPD officer participated in the investigation who should not have.

Further, the current Chief of the CFPD[3] has indicated to the Government that "record keeping at the CFPD was in ***disarray*** when he took over from the prior administration." Bates stamp 945 (emphasis added). The current Chief also has stated that he could not locate personnel files of officers within the CFPD upon his assuming office, that evidence stored at the CFPD was not accompanied by "log-in sheets,[4]" and that he had to inventory all the evidence the CFPD stored and move it to a different, secure room within the CFPD.

## ARGUMENT

In *United States v. Sager*, 227 F.3d 1138 (9th Cir. 2000), a federal grand jury indicted Sager for mail theft and other offenses in a multi-count indictment. At trial, the Government produced evidence that Sager used a victim's identity to make a purchase at a department store.

U.S. Postal Inspector Morris traveled to the department store and interviewed the clerk who conducted the transaction with Sager. According to the clerk, the face of the

---

[3] The current chief of the CFPD was not in office on November 9, 2021. He took office in February of 2022.

[4] Based on the context of the communication, the undersigned interprets the phrase "log-in sheets" as used by the current Chief to mean "property and evidence sheets." As a matter of well-established law enforcement protocols decades old, property and evidence sheets accompany evidence police seize so they can track the identity of each person who comes in contact with a piece of evidence and what that person did with the evidence. Although the undersigned may have missed it, and apologizes if he has, he has not been able to locate any property and evidence sheet that deceased officer generated upon seizing the envelope, letter, and powder that were delivered on November 9th.

man in the photo Morris showed her, Sager, "look(ed) similar" to the man's face who

conducted the transaction with her.

At trial, defense counsel impeached Morris on inconsistencies in how he relayed the

clerk's identification of Sager to a grand jury and to others during the investigation and

prosecution.   As the cross-examination of Morris continued, defense counsel began to

question Morris about other aspects of his investigation of Sager.   "Sager's counsel

questioned Inspector Morris on various other aspects of his investigation. He asked

Inspector Morris about his visits to the various stores at which (the victim's)  credit card

had been used, including whether he had checked surveillance tapes at the stores, the

location of the various surveillance cameras, and who he had spoken to at the stores."

*Sager*, 227 F.3d at 1143.

The district court interrupted the cross-examination, prohibited defense counsel

from continuing to delve into the investigation, and provided an instruction to the jury.

> What I am telling you is that you are not here to grade his investigation. You are
> here to grade the product of that investigation, that is, the evidence. If the evidence
> in this case convinces you beyond a reasonable doubt that the defendant committed
> crimes, then you ought to find him guilty. If it does not, you ought to find him not
> guilty. It is as straight forward as that. It doesn't depend on how well you think this
> agent conducted his investigation. What's important is what's before you by way of
> evidence.

*Sager*, 227 F.3d at 1143.   Ultimately, the jury convicted Sager on some counts and

acquitted him on others.  He appealed.

5

On appeal, the Ninth Circuit held that the district court committed plain error by limiting

defense counsel's cross-examination and by erroneously instructing the jury.

> We agree with Sager that the district court committed plain error and abused its discretion by instructing the jury not to "grade" the investigation. In one breath, the court made clear that the jury was to decide questions of fact, but in the other, the court muddled the issue by informing the jury that it could not consider possible defects in Morris's investigation. To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information. . . . Details of the investigatory process potentially affected Inspector Morris's credibility and, perhaps more importantly, the weight to be given to evidence produced by his investigation. Defense counsel may have been fishing for flaws, but it is obvious that he cast his bait in a promising pond.

*Sager*, 227 F.3d at 1145.

Compared to the "promising pond" in *Sager*, the CFPD, its officers, its investigation

in this case, its contemporaneous investigations in other cases, and its unprofessional

investigatory practices as explained by its current chief, constitute a treasure trove of

exculpatory information that would allow the jury to properly assess how "details of the

investigatory process potentially affected (officer's and deceased officer's) credibility and,

perhaps more importantly, the weight to be given to evidence produced by (their)

investigation (such as forensic evidence coming from the envelope and stamp deceased

officer seized)."[5]

---

[5] Information the current CFPD Chief has provided about flaws in CFPD evidence collection and storage he noticed when assuming office directly impacts the jury's consideration of the envelope, stamp, and accompanying forensic evidence the Government will seek to introduce. If CFPD officers routinely failed to follow appropriate practices in collecting evidence in the Fall of 2021, it is more probable than not that deceased officer also did so when he collected the evidence in this case, especially when

The Government has produced and defense counsel has uncovered exculpatory evidence that undermines the credibility of officer, deceased officer, the CFPD, and the investigative techniques they used in investigating this case. The Defendant should be allowed to introduce evidence of the poor investigative techniques officer, deceased officer, and the CFPD used during this time to allow the jury to determine what weight, if any, it should assign to CFPD officer(s)' testimony and/or the evidence they seized in this case.

## CONCLUSION

For the foregoing reasons, the Defendant moves to admit evidence of the poor investigative techniques officer, deceased officer, and the CFPD utilized in investigating this case and other cases contemporaneously.

Respectfully submitted,

s/ Andrew B. Moorman, Sr.
Attorney for Defendant
Moorman Law Firm, LLC
416 East North Street
2nd Floor
Greenville, South Carolina 29601
864-775-5800
andy@andymoormanlaw.com
Federal ID # 10013

Greenville, South Carolina
July 1, 2024.

---

the Government's discovery suggests he failed to store the envelope, the letter, and the stamp in a secure location after seizing it and failed to generate a property and evidence sheet to track who came in contact with the evidence and what each person did with it while in the custody of CFPD.