IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 8:23-0749 |
| | ) | |
| | ) | |
| -vs- | ) | **MOTION TO** |
| | ) | **INTRODUCE** |
| | ) | **SPECIFIC INSTANCES** |
| J. CHRISTOPHER MCCASLAN | ) | **OF CONDUCT** |

COMES NOW, the Defendant, J. Christopher McCaslan, by and through the undersigned, who moves this Court to allow the introduction of evidence related to specific instances of conduct undertaken by members of the Calhoun Falls Police Department (CFPD). Evidence of these specific instances of conduct relates to officers who performed vital tasks associated with the investigation of this case, and these instances of conduct bear directly on the officer(s) willingness to be dishonest and/or to the officer(s) willingness to abuse power while executing their duties as law enforcement officers.[1]

## FACTS

On the afternoon of November 9, 2021, a mail carrier delivered a letter to 318 Rice

---

[1] See generally, *Deary v. City of Gloucester*, 9 F.3d 191, 196 (1st Cir. 1993) ("Under Fed.R.Evid. 608, evidence of the truthful character of a witness is only admissible after the witness' character has been attacked, but there is no corresponding limitation on introducing evidence about the untruthfulness of a witness. Officer Maki was the officer who was located closest to Officer Bichao when the alleged kicks to Walter Deary's head took place. His testimony about the arrest was crucial to the trial. By testifying to the events of the night in question, he put his credibility into issue. Questions to his supervisor regarding the supervisor's opinion of Officer Maki's truthfulness were clearly proper.")

Street in Calhoun Falls, South Carolina. The mail carrier noticed an empty soda can in the mailbox at the time he delivered the letter.

A Calhoun Falls police officer[2] and his fiance' were present at the location when the letter was delivered. When fiancé opened the letter, she noticed powder in the letter and made the officer aware of it. The officer then took steps to investigate: he contacted his supervisor at the police department, who is now deceased ("deceased officer"), he collected portions of the powder for testing and evidence preservation, he spoke to the mail carrier, and he performed other investigative tasks immediately after the letter arrived.

The deceased officer arrived on scene, and he and the officer continued to investigate. They performed multiple field tests on the powder, which yielded different results,[3] and the deceased officer took possession of the letter, the envelope, and what remained of the powder. According to the Government's discovery, the deceased officer then "put all the items except the drug test kits into an evidence bag and put it on his desk at the (Calhoun Falls Police Department or CFPD)." Bates stamp 008. The Government's discovery contains allegations that a stamp on this envelope is forensically linked to the Defendant. The deceased officer also admitted that he was the one who had put the soda

---

[2] Because the names of these individuals do not appear in any of the publicly filed pleadings in this case, upon the undersigned's information and belief, this pleading will not mention the specific names of these officers or civilian(s) to continue to protect their privacy.

[3] Ultimately, the powder was found to be a mixture of "milk-based infant formula, water, and Linseed Oil." Bates stamp 003.

2

can in the mailbox as a "prank." Bates stamp 008.

The following day, November 10, 2021, Calhoun Falls Post Office employees notified law enforcement that they had received another suspicious letter from the Greenville Post Office Distribution Center. This letter was addressed to the CFPD and also was found to contain a harmless powder. The second letter referenced the deceased officer as well as another officer with the CFPD, "P.H."

Beginning on November 9th, and continuing in the days, weeks, months, and years that followed, SLED agents conducted multiple, recorded interviews of the officer, deceased officer, P.H., and other law enforcement officers associated with the CFPD. Additionally, some or all of these CFPD officers executed signed statements that discussed investigative steps they took, not only related to the events that occurred on November 9th and later, but also in connection with another possible target of the investigation, the Defendant's wife, "KM." Both the officer and P.H. had investigated KM within the preceding month for engaging in criminal activity on more than one occasion. The Government has produced in discovery report(s) that officer wrote about his interaction with KM approximately one month earlier.

Consistent with its obligations pursuant to *Brady* and *Giglio* and Rule 16, the Government has produced these recordings of the interviews, reports, statements, and other materials in discovery. Most importantly for the purposes of this Motion, evidence the Government has produced in discovery, by way of a recorded interview of P.H., indicates that officer and deceased officer engaged in corruption in connection with a political race

3

that was occurring in Calhoun Falls during the relevant time period of this case. Specifically, P.H. indicated to SLED agent(s) that he witnessed officer and/or deceased officer improperly write ticket(s) to a Calhoun Falls mayoral candidate in retaliation for the candidate running for mayor. Upon information and belief, the mayoral race was decided very close in time to November 9th and 10th, 2021, when the Government claims the two letters that are the subject of the indictment(s) were sent and/or received.

Also, the Defendant has been made aware of the possibility that a police department for whom the deceased officer worked before coming to the CFPD terminated the deceased police officer for being dishonest. To be clear, the Defendant does not know whether this happened, and, at this juncture, does not claim that it did. The Government is taking steps to determine the veracity of this information pursuant to its discovery obligations under *Brady* and *Giglio*. Should this information exist, the Defendant will also seek to introduce evidence related to specific instances of the deceased officer's dishonesty at the previous police department.

## **ARGUMENT**

This Court should allow the Defendant to admit evidence related to officer's and deceased officer's using their authority to punish a political candidate and evidence related to deceased officer's dishonesty while working as a police officer, if such evidence exists, as this evidence is admissible under the Federal Rules of Evidence.

### **This evidence is relevant.**

Pursuant to F.R.E. 402:

Relevant evidence is admissible unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute;
- these rules; or
- other rules prescribed by the Supreme Court.

Irrelevant evidence is not admissible.

F.R.E. 401 defines what "relevant evidence" is:

Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

**(b)** the fact is of consequence in determining the action.

Fed. R. Evid. 401.

Courts have consistently held that exculpatory information, especially as it relates to the credibility of important law enforcement participants in the investigation, is "highly relevant," even for law enforcement officers who do not testify, like the deceased officer. See e.g., *United States v. Alorwornu*, 2024 WL 1050326, at *8 (D. Conn. 2024) (citing and quoting *United States v. Ulbricht*, 858 F.3d 71, 108 (2d Cir. 2017) (abrogated on other grounds by *Carpenter v. United States*, 585 U.S. 296 (2018) ("*Ulbricht* recognizes that, even if an investigator is not called as a government witness, if the Government's trial evidence relies on the investigator's credibility, 'his character for truthfulness would [be] at issue during the trial, and information that impeached his credibility would [be] highly relevant.....'").

5

In this case, the Government will likely rely to a great extent on officer's and deceased officer's credibility: they were the first officers who handled arguably the most important piece of physical evidence in the case, the envelope and the stamp on the envelope that the Government alleges contains forensic evidence that is favorable to its case. Deceased officer and officer repeatedly tested powder substance in the envelope and letter, and deceased officer was the seizing officer of this evidence and the one responsible for maintaining the integrity of the envelope, stamp, letter, and powder for evidentiary purposes.

Further, deceased officer's and officer's interactions with potential witnesses, including but not limited to KM and the Defendant, and their representations about these interactions are critical both to the Government's ability to prove who knew what when, and/or which of these officers and witnesses are biased against the Defendant and would have a reason to lie.

This evidence is relevant, and, therefore, admissible unless some other rule or statutory or Constitutional provision render it inadmissible.

### No other provisions of law exclude this relevant evidence.

The Defendant cannot say with certainty whether the Government will oppose the introduction of this evidence, and if so, the bases on which it will rely to oppose its introduction. Therefore, the Defendant does not wish to speculate by way of responding to arguments the Government has not yet made. Instead, the Defendant will address the

6

specific arguments in his reply the Government makes in its response, if it chooses to do so, as to the specific principles of law that it claims render this evidence inadmissible.

At this juncture, however, the Defendant does not believe the Government's potential arguments on inadmissibility will be persuasive. For example, generic justifications parties often use to keep out evidence, like the Federal Rules of Evidence's prohibition against the introduction of evidence whose probative value is substantially outweighed by the danger for unfair prejudice,[4] will likely <u>not</u> serve to bar the introduction of this evidence.

## **CONCLUSION**

For the foregoing reasons, the Defendant moves this Court to admit evidence of specific instances of conduct referenced above.

---

[4] See generally, *United States v. Nelson*, 365 Fed. Supp. 2d 381, 390 (S.D.N.Y. 2005) (allowing the Defendant to cross-examine a police officer, Rodriguez, about a police commissioner's finding that Rodriguez's testimony in an unrelated administrative matter was not credible and stating that "[t]he Court disagrees with the Government's view that Commissioner Sarner's finding in Rodriguez's 2003 Trial 'lack[s] any probative value concerning [his] 'character for truthfulness or untruthfulness. . . .' Rather, the Court finds that Commissioner Sarner's finding has significant probative value. in this regard."

7

          Respectfully submitted,

          s/ Andrew B. Moorman, Sr.
          Attorney for Defendant
          Moorman Law Firm, LLC
          416 East North Street
          2nd Floor
          Greenville, South Carolina 29601
          864-775-5800
          andy@andymoormanlaw.com
          Federal ID # 10013

Greenville, South Carolina
July 1, 2024.