IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 8:23-0749 |
| | ) | |
| | ) | |
| -vs- | ) | **REPLY TO USA'S** |
| | ) | **RESPONSE AT** |
| | ) | **DOCKET ENTRY 80** |
| J. CHRISTOPHER MCCASLAN | ) | |

COMES NOW, the Defendant, J. Christopher McCaslan, who replies to the Government's response contained in docket entry 80. Because the Government's response was an omnibus response, the Defendant will reply to each response.

### **Evidence of CFPD's Poor Investigative Techniques**

The Government opposes the Defendant's introduction evidence related to the Calhoun Falls Police Department's (CFPD) use of poor investigative techniques. It states the generic, legal premise that "the only question for the jury is whether the evidence proves that the Defendant committed the crimes charged beyond a reasonable doubt." Docket entry 80, at 4 (citations omitted). In support of its argument, the Government cites cases, including *United States v McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998), for the proposition that "[u]nder our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation."). Docket entry 80, at 4.

1

*McVeigh* and other cases the Government cites merely state a generic premise, but this authority should not be viewed as categorically barring such evidence. "In *United States v. McVeigh*, the Tenth Circuit held that generally, the facts surrounding the government's investigation may become relevant only when they would affect the reliability of a particular piece of evidence." *United States v. Perrault*, 2019 WL 1375666, at *1 (D.N.M. 2019) (internal quotation marks and citations omitted). Further,

> The quality or bias of the government's investigation that produces the evidence that is submitted to the jury may affect the reliability of the evidence, and would therefore be relevant information. *See United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) (citing *Kyles v. Whitley*, 413 U.S. 419, 446 (1995); *see also Lowenfield v. Phelps*, 817 F.2d 285, 291–92 (5th Cir. 1987) (finding defense's strategy to argue that "sloppy police work reflected adversely on the state's entire case" was reasonable), *aff'd on other grounds*, 484 U.S. 231 (1988). It may bear on the quality of the government's witnesses and, "perhaps more importantly, the weight to be given to evidence produced by [the] investigation." *Sager*, 227 F.3d at 1145. Evidence that testifying agents may have engaged in misconduct may also be admissible to show motive or bias. . . .

*Perrault*, at *1.

Evidence related to poor investigative techniques used by officer and deceased officer, as corroborated by the CFPD's police chief's testimony as to a lack of record keeping (especially related to evidence collection), goes directly to "the reliability of a particular piece of evidence," the Government's supposed DNA evidence from the stamp. In recorded interview(s) with SLED agents on the day the first letter was received, officer admitted that he and/or deceased officer already had made mistakes in their investigation. Based on the discovery the Government produced, it appears that deceased officer failed

to create a property and evidence sheet to describe exactly what he did with the envelope, letter, stamp(s), and powder from the time he seized it until the time SLED personnel interacted with it hours later that day. The Government also has produced evidence in discovery that demonstrates it is possible that the Defendant's ex-wife, another target of the investigation initially, worked as a confidential informant for deceased officer off the books.

The Defendant understands why, as a general proposition, juries are instructed not to consider the quality of investigative techniques police used in the case. If such an invitation was extended in every case, it is likely that the police would be held to an impossible standard: they would be expected to fingerprint every piece of physical evidence, conduct DNA analyses on everything, record every interview, etc. This case is different.

The most important piece of physical evidence in the Government's case, the DNA it claims was collected from the stamp on the envelope with the first letter, was collected and/or in the custody of deceased officer who:

- Possibly clandestinely used another target of the investigation as a confidential informant;
- Was deemed untrustworthy by a fellow police officer;
- Possibly misused his authority as a police officer to write ticket(s) to a mayoral candidate who was running against a friend;

3

- Failed to use standard protocols when collecting evidence by failing to generate a property and evidence sheet to describe what he did with the evidence between the time he seized it and the time SLED personnel made contact with it;

- Failed to store the evidence in a secure location, by his own admission storing it on his desk instead of a secured property and evidence room; and

- Made mistakes in the initial investigation, according to officer.

This evidence would likely "affect the reliability of a particular piece of evidence," the DNA evidence, and "bear on . . . the the weight to be given to evidence produced by [the] investigation." See *supra*, at 2. Under these unique circumstances, this evidence is highly relevant, and the jury should be allowed to hear it so it can have the tools it needs to be able to assign accurately what weight, if any, the Government's DNA evidence should have.[1]

## Evidence of Deceased Officer's Credibility

The Government argues that deceased officer's credibility is not in issue because the investigative steps he took are corroborated by other witnesses, because he was only a

---

[1] The Government repeatedly characterizes deceased officer as merely a "taxi" for this evidence to minimize his involvement with the investigation. Docket entry 80, at 8. The Defendant strongly disagrees with this assertion: anyone who has unsupervised access to the most important piece of physical evidence to the Government's case and whose credibility is in doubt is a critical component to this case.

4

taxi driver for the evidence, and because proof of a strict chain of custody is not required for this evidence to be admissible.

### All of deceased officer's actions are not corroborated.

No one knows what deceased officer did with the evidence from the time he seized it until the time SLED personnel interacted with it on deceased officer's desk more than three hours later.  Deceased officer did not complete a property and evidence sheet that accompanied evidence, and, upon information and belief, the Government will not be able to explain with live testimony where the bag was and in what condition it was during this period.

### The Government assumes deceased officer was just a "taxi driver."

No one can know whether deceased officer was just a taxi driver because we do not know exactly what the deceased officer did in that three hour to four hour period from the time he seized the evidence until the time SLED personnel interacted with it.  The Government's characterization of the deceased officer as "just a taxi driver" assumes he was a credible participant in the investigation and did what he was supposed to do.  This gets at the heart of why evidence of deceased officer's lack of credibility is essential.  If the jury believes deceased officer was just a taxi driver, it will likely assign more weight to the DNA evidence.  However, should someone who has been deemed untrustworthy by at least one other police officer, who has arguably engaged in political corruption, who

5

possibly utilized another target of the investigation as a confidential informant, and who likely made mistakes in the initial investigation be viewed "just as a taxi driver?" The Defendant believes that is for the jury decide after being given the information it needs to adequately assess deceased officer's credibility.

## Weight v. Admissibility

The Government seems to argue that because a strict chain of custody for the DNA evidence is not required for admissibility under federal law, somehow deceased officer's credibility is less relevant.[2] Even if this Court were to find that the DNA evidence was admissible because the Government had properly authenticated it, the jury still has the obligation to assess the credibility of the investigation that produced the evidence in determining what weight to assign to it. See generally, *Simmons v. Ford Motor Co.*, 576 F. Supp. 3d 1136, 1148–49 (S.D. Fla. 2021) (finding that expert opinion was admissible under *Daubert*, but stating that "Defendants main critique, that Dr. Harless, Defendant's economist, disagrees with Stockton's application of the theory, goes to weight, not admissibility; in other words, the trier of fact would be tasked with determining which experts' methods they find to be more credible.").

The Government's argument is actually backwards. The Government's position, that the DNA is admissible because a strict chain of custody is not required, makes deceased officer's credibility even more relevant. If the jury will be tasked with

---

[2] The Defendant will likely oppose the admissibility of the DNA evidence.

determining how much weight to assign to the physical evidence that deceased officer collected, it will only be able to perform this task if it has the tools it needs to assess deceased officer's credibility. If the Government did not seek to introduce this evidence, or if this evidence is inadmissible (which the Defendant likely will argue that it is), deceased officer's credibility would become less relevant and may not be an issue. In fact, should the Government decide not to seek to admit this evidence, the Defendant likely would withdraw this motion.

### Evidence related to mayoral race and police corruption

The deceased officer's actions and officer's actions related to the mayoral race occurred very close-in-time to the date the first letter was received, November 9, 2021, and likely well within the date range alleged in the cyberstalking charge contained in Count 1. Evidence that shows officer and deceased officer were engaged in corruption and/or failed to adequately discharge their duties as police officers <u>during the same period</u> in which they were investigating this case is highly relevant to the jury's assessment of the credibility of critical evidence they seized in the case. This is not a situation where the Defendant wants to introduce evidence of officer's and/or deceased officer's failures years before this incident occurred. The evidence shows that officer and deceased officer were potentially engaged in misconduct <u>during the period alleged in Count 1 of the indictment</u> and extremely close-in-time to this investigation. Evidence that occurred within this specific period, a period that coincided with the investigation and coincides with the allegations in the indictment is highly relevant as to the credibility of the law enforcement personnel who

7

seized the most critical physical evidence to the Government's case, and, therefore, should be admissible.

The Government's response to this motion also extrapolates what it believes the Defendant's defenses will be based on his desire to educate the jury on officer and/or deceased officer's credibility, or lack thereof. "The Government supposes Defendant wants to challenge whether the threatening letter was actually received by Victim 1 and 2 or whether the letter recovered by SLED is the actual letter received." Docket entry 80, at 10. "There has been no switch and the Government is unclear if Defendant really believes this or intends to make such an argument." Docket entry 80, at 10. The Government's speculative arguments as to what defenses the Defendant intends to assert miss the mark.

In another of its many exhaustive attempts to marginalize deceased officer's role in this investigation and in this case, the Government seeks to make the envelope, letter, and the DNA allegedly on it non-fungible, or readily identifiable. If the Government succeeds on this front, than deceased officer suddenly becomes much less important to its case. See generally, *United States v. Espinal-Almeida*, 699 F.3d 588, 609 (1st Cir. 2012) (internal quotation marks and citations omitted) ("Evidence is properly admitted if it is readily identifiable by a unique feature or other identifying mark.. If that is not the case, or if the evidence is susceptible to alteration, a testimonial tracing of the chain of custody is needed.").

The evidence deceased officer collected is comprised of an envelope with stamps on it, a letter, and powder. Arguments for authentication in connection with each piece of evidence will potentially be different. However, evidence related to the stamp and the DNA the Government alleges is present on the stamp is <u>not</u> readily identifiable and will require proof of chain of custody for admissibility. See e.g., *United States v. Brooks*, 2011 WL 3847142, at *4 (D. Kan. 2011) (Applying chain of custody requirement to DNA evidence).

### **A final thought: the impact of deceased officer's death**

Throughout the Government's pleadings, it appears to rely on the deceased officer's death as a basis to argue that his credibility is not an issue or somehow no longer fair game for cross-examination. E.g., Docket entry 80, at 7 ("Here, the Assistant Chief is not a testifying witness because he is deceased."). This is incorrect.

The Federal Rules of Evidence clearly contemplate the introduction of evidence related to the credibility of deceased witnesses. For example, F.R.E. 806 reads in pertinent part:

> When a hearsay statement — or a statement described in Rule 801(d)(2)(C), (D), or (E) — has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. . . .

The Government is relying on critical evidence deceased officer seized. As such, deceased officer's credibility is in issue, and his death cannot and does not change this.

## **CONCLUSION**

The parties disagree on numerous issues, but appear to agree on one basic premise. If the DNA evidence is admissible, which the Defendant does not concede, the jury will be deciding what weight, if any, to assign to this evidence. See Docket entry 80, at 12 ("Any doubts the missing testimony of the Assistant Chief may raise regarding the chain of custody is for the jury to weigh in determining the import of the evidence."). The Government has brought a prosecution based, in part, on DNA evidence collected by and seized by an officer who is now deceased. The Defendant has evidence, much of which has been produced by the Government to its credit, that this officer engaged in misconduct during the exact time period in which the conduct alleged in the indictment occurred, failed to use proper investigative techniques when collecting and seizing the DNA evidence, was distrusted by at least one other police officer, and made mistakes during this investigation.

The Government adroitly and logically seeks to both minimize his importance to the case and to bolster his credibility by characterizing him as a "taxi driver." His involvement was much more important, though. Whether deceased officer was merely a taxi driver or something else is exactly the type of question this jury should be required to answer. All the Defendant seeks is to be able to provide the jury with the requisite information it needs to answer this question fairly and accurately.

Respectfully submitted,

<u>s/ Andrew B. Moorman, Sr.</u>
Attorney for Defendant
Moorman Law Firm, LLC
416 East North Street
2nd Floor
Greenville, South Carolina 29601
864-775-5800
andy@andymoormanlaw.com
Federal ID # 10013

Greenville, South Carolina
July 26, 2024.